# STATE OF MICHIGAN

# COURT OF APPEALS

JEANINE BURMEISTER,

Plaintiff-Appellant,

v

AARON COLE,

Defendant-Appellee.

UNPUBLISHED
September 27, 2016

No. 329899
Wayne Circuit Court
Family Division
LC No. 11-106573-DC

Before: BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Plaintiff appeals by right an October 5, 2015, order granting defendant's motion for a change of custody and denying plaintiff's motion for modification of parenting time. For the reasons set forth in this opinion, we affirm the court's order regarding custody, vacate the court's order with respect to parenting time, and remand for further proceedings consistent with this opinion.

## A. FACTS

Plaintiff and defendant are the unmarried parents of EC (d/o/b: October 3, 2009). Plaintiff and defendant met while attending Western Michigan University and reinitiated a dating relationship while both were residing in Georgia; defendant was working in Georgia and plaintiff was pursuing a master's degree. They returned to Michigan and shortly thereafter plaintiff discovered that she was pregnant. Plaintiff and defendant were residing together when EC was born and continued to live as a family until approximately May 2011, when the parties broke off their relationship.

Plaintiff filed a complaint for custody on May 27, 2011; defendant filed a counter-complaint for custody shortly thereafter. Plaintiff also petitioned to change the domicile of EC to Georgia. At about the same time, Child Protective Services (CPS) became involved after plaintiff raised concerns about EC regarding potential sexual abuse by defendant. In conjunction with the CPS investigation, Dr. Bethany Mohr of C. S. Mott Children's Hospital Child Protection Team evaluated EC in July of 2011. During her interview with Dr. Mohr, plaintiff acknowledged a lack of evidence of sexual abuse, but asserted having a "bad feeling." Finding the genital examination to be "within normal limits," Dr. Mohr opined that while she could not "exclude the possibility of sexual abuse," that she did not view EC's behaviors, premised on her

-1-

age and developmental level, to comprise "sexual behaviors or 'panic attacks.'" Dr. Mohr expressed concern that plaintiff "may be misinterpreting [the minor child's] actions/behaviors as signs of sexual abuse due to [plaintiff's] underlying concern about possible sexual abuse. . . ." CPS ultimately determined that the allegations were unsubstantiated and closed the investigation.

On August 24, 2011, the trial court entered a custody order awarding physical custody to plaintiff in Georgia with defendant to have parenting time with EC in Michigan for the first seven days of the month. The order would be revised after EC was school-age.

The custody arrangement lasted until January 31, 2013, when plaintiff moved to suspend defendant's parenting time. Plaintiff alleged that EC made statements indicating that defendant sexually abused EC. After plaintiff revealed the alleged statements to Karen McDonald, Ph.D., McDonald contacted the authorities in Michigan and Georgia and CPS and Georgia Protective Services became involved in the case. Shortly thereafter, defendant also filed a CPS complaint alleging that plaintiff physically abused EC.

During the CPS investigations, the trial court ordered that defendant's parenting time be supervised by the grandparents and the court appointed Dr. James Bow to investigate the alleged abuse and make recommendations.

In April 2013, CPS concluded that none of the alleged claims of abuse were substantiated. Similarly, on June 16, 2013, Dr. Bow submitted a report finding that plaintiff's complaints of suspected abuse were not substantiated. Instead, Dr. Bow indicated that plaintiff "projects many of her own dynamics and fears on her child" and that none of the collateral sources contacted by Dr. Bow reported observing sexualized behavior by EC. Dr. Bow concluded that EC was not the victim of sexual abuse and that plaintiff was a "sincere, hyper-vigilant mother [who] inaccurately believes her daughter has been the victim of sexual abuse." As a result, Dr. Bow recommended that plaintiff participate in individual therapy and that sexual abuse therapy for the minor child not continue, with coordination of EC's medical treatment through her Georgia pediatrician to facilitate "good communication between the providers."

On July 10, 2013, the trial court reinstated defendant's unsupervised parenting-time schedule, ordered additional parenting time to make up for the time that defendant lost, and restricted plaintiff's ability to obtain therapy for EC. The court ordered plaintiff to participate in individual therapy with a therapist approved by Dr. Bow.

On August 1, 2013, defendant filed an ex-parte motion for change of custody and to change EC's domicile from Georgia to Michigan. Defendant alleged that plaintiff had finished her graduate program and had promised to return to Michigan after her schooling. Defendant also alleged that plaintiff falsely accused defendant of sexual abuse, that plaintiff was alienating EC and defendant and that plaintiff was committing medical abuse against EC.

After the trial court denied the ex-parte motion, on August 8, 2013, defendant refiled his motion. A Friend of the Court (FOC) referee found that circumstances had changed such that the court should revisit custody. The referee cited plaintiff's false accusations as changed circumstances. After there were no objections to the referee's findings, the referee's findings became an order of the trial court.

On January 21, 2014, Stephanie Newberry of the FOC provided a report regarding custody and parenting time. Newberry reported the following statements by plaintiff during her interview,

"I am supposed to be in counseling to work on being overprotective." Although in counseling, she also said she feels [defendant] did sexually abuse their daughter despite CPS, law enforcement and medical professionals not coming to the same conclusion. [Plaintiff] reported that [EC] "is great behaviorally and has stopped all the weird stuff." She admitted being hypervigilant when it comes to [EC.]

Plaintiff denied attempting to interfere or preclude defendant from having a relationship with EC. "[R]ather, [plaintiff] insisted she had been trying to protect her daughter from what she believed was sexual abuse based upon 'weird behaviors' (sexualized behaviors) the minor child was saying and doing. Reportedly, this behavior has now stopped." Newberry interviewed the parties, observed them interacting with EC, acknowledged the involvement of CPS, and a review of the custody factors, and concluded:

The parties engaged in mud-slinging and made several he-said, she-said allegations which could not be substantiated. [Plaintiff] insisted that she believed what she was doing was trying to protect her daughter. [Plaintiff] is involved in counseling services to address her "over-protection" and to gain insight into how her behaviors could negatively affect her daughter's relationship with [defendant]. At this time, it is the opinion of this evaluator that there does not appear to be a significant change in circumstances to recommend a change in custody provided [plaintiff] continues to follow the Orders of this Court. She must continue to comply with all parenting time provisions and her mental health treatment services. If [plaintiff] fails to comply with the Order of this Court, the Court should consider granting [defendant] sole legal and sole physical custody of the minor child[.]

The trial court held a motion hearing on March 5, 2014. At this hearing, a new judge was assigned to the case. At the hearing, plaintiff submitted a letter from Dr. William Buchanan to substantiate that she complied with the court's order to obtain individual counseling. In the letter, Dr. Buchanan indicated that plaintiff was receiving appropriate treatment and indicated that plaintiff's current "mental health issues do not negatively affect her ability to properly care for and meet all of the physical and emotional needs of her child." In addition, Dr. Buchanan testified via telephone, wherein Dr. Buchanan asserted that the therapy had been "productive" and "appropriate" for the issues being addressed and that plaintiff was "consistent" regarding her attendance. Dr. Buchanan related that plaintiff has "clearly" indicated her understanding that she has misperceived information, leading Dr. Buchanan to opine "I have seen nothing that made me feel that she's doing that at this point." Instead, the focus on therapy was "to help [plaintiff] understand how she got to that position to where she was misconstruing things . . . and try to be preventative for the future."

Dr. Buchanan explained "stopping the behavior has occurred, as best I can tell. Stopping the misperceiving things so negatively has not occurred, as best I can tell." However, "understanding why her perception got skewed is still a work in progress." Dr. Buchanan

described plaintiff's progress as an absence of her previous emotional tendency to "spiral out of control." He found her to be "handling things in a more rational, thoughtful sort of way" and being "less reactive," and voluntarily seeking feedback to validate her perceptions. Dr. Buchanan was not aware of the FOC report prepared by Newberry. Dr. Buchanan acknowledged that treatment was a continuing process and had not reached a conclusion, but that he was "very pleased with the progress."

On March 6, 2014, the trial court continued the hearing. Newberry testified and reiterated what was in her FOC report and reiterated that she had no concerns about plaintiff's ability to care for EC. Newberry stated that plaintiff was not speaking to EC regarding "adult issues," and indicated that plaintiff was in counseling and that the court should review plaintiff's progress as to the counseling.

On March 10, 2014, on the record, the trial court appointed a legal guardian ad litem (LGAL), extended defendant's parenting time, ordered that plaintiff's parenting time be supervised at the maternal grandparent's home, and concluded that plaintiff presented a risk of harm to EC. Thereafter, plaintiff filed an emergency motion for reconsideration, arguing that the trial court erred in changing custody. The court denied the motion and defendant moved for a new parenting time order to reflect the trial court's March 10, 2014 rulings. The court agreed and on April 7, 2014, entered a parenting time order requiring that plaintiff transfer EC to defendant following her parenting time in Michigan. The trial court made findings that Newberry and Dr. Buchanan's testimony constituted proper cause to change parenting time. The court indicated that it had not yet addressed custodial environment or best interests.

In the meantime, plaintiff applied for leave to appeal the trial court's March 10, 2014, order. In lieu of granting the application, this Court entered a peremptory order vacating the March 10, 2014, trial court order, explaining:

> The record indicates that the circuit court has not yet held a best interests hearing. Even assuming that the order was not a change in custody and was limited only to parenting time, a trial court may modify or amend previous orders for parenting time only for "proper cause shown or because of change of circumstances." The materials before this Court do not reflect a change in circumstances sufficient to support the order entered in this matter. [*Burmeister v Cole*, unpublished order of the Court of Appeals, entered May 28, 2014 (Docket No. 321512) (citation omitted).]

In addition, this Court directed the trial court "to begin evidentiary hearings as scheduled" and indicated that the order was to have "immediate effect." *Id.*

On remand, on June 4, 2014, the trial court issued an amended opinion and order for temporary change of custody. The trial court found that the multiple allegations of sexual abuse amounted to proper cause to revisit custody. The trial court then proceeded to apply the best interest factors and awarded temporary physical custody to defendant and joint legal custody.

In the meantime, plaintiff filed an application for leave to appeal the May 30, 2014, order and filed a complaint for a writ of superintending control. This Court denied both the application

and the complaint, holding that leave was not warranted given the trial court's June 4, 2014, order.[1]

On June 11, 2014 through December 8, 2014, the trial court held an evidentiary hearing to determine permanent custody. Both defendant and plaintiff presented witnesses who offered testimony regarding their fitness as parents. Defendant's sister testified that plaintiff smokes and drinks and is not expressive when transferring EC to defendant. She opined that plaintiff's demeanor and lack of verbal interaction during transfers negatively impacted EC. Defendant's sister criticized plaintiff's parenting style suggesting plaintiff behaved more as a friend than a parent to the child. She asserted plaintiff made negative comments regarding defendant when the child was out of "earshot" and that she had never observed defendant to behave inappropriately or in a sexual manner with EC.

Stephanie Bond testified that plaintiff told her that defendant molested EC in 2012. Bond wrote a letter on behalf of defendant and she stated that plaintiff's interactions with EC were more akin to that of a "peer" than a parent.

Defendant's aunt testified regarding comments she found "odd" by EC suggesting plaintiff was instructing her to not allow people observe her getting dressed. Defendant's aunt interpreted the comments, which occurred on one day, as plaintiff conveying a "tone" to the child to not trust defendant and acknowledged that the child further expressed that she may have misunderstood plaintiff and "got it wrong." Although defendant's aunt had last seen plaintiff and EC together in 2011 she opined that plaintiff lacked a "motherly bond" with EC and made poor food choices for EC.

In a similar vein, defendant's mother testified, she is a registered nurse. She opined that plaintiff dominates conversations and suggested plaintiff interacts with EC as a friend rather than a parent. When interviewed by Dr. Bow she indicated that one of plaintiff's strengths is her attentiveness to EC.

Defendant testified that he provided the majority of the transportation costs and had additional time with EC. Defendant voluntary submitted to and passed polygraph examinations regarding the alleged sexual abuse. Defendant asserted that EC's comment, which led to the initiation of one of the CPS investigations, involved his touching the child's buttocks to apply ointment for a rash. He asserted that plaintiff served as the source of the April 9, 2013 CPS complaint and that plaintiff denied him video contact with EC. Defendant referenced an April 3, 2013 text message from plaintiff indicating she would not permit him to see EC because of what defendant had done to the child. Defendant indicated his profession was a building contractor, but acknowledged that he did not have a contractor's license or any form of journeyman certification. Defendant admitted having obtained a medical marijuana card, which he

---

[1] *Burmeister v Cole*, unpublished order of the Court of Appeals, entered June 9, 2014 (Docket No. 322011); *Burmeister v Cole*, unpublished order of the Court of Appeals, entered June 9, 2014 (Docket No. 322013).

subsequently discontinued, to address a problem he has with sciatica. Defendant acknowledged contacting CPS to report plaintiff due to a bruise on EC's leg following a parenting time transfer.

Plaintiff's counsel called three friends or co-workers of defendant to testify concerning a lifestyle, which plaintiff had asserted is attributable to defendant's involvement as a drug dealer.

Emily Kaiser Courtney, resided with plaintiff in Georgia and was plaintiff's college roommate. Plaintiff and EC initially lived with Courtney and her husband before obtaining their own home in Georgia. She indicated that plaintiff reported that defendant was verbally abusive during their relationship and opined that after Dr. Bow had concluded his report that plaintiff seemed to acknowledge that the feared abuse was the result of her misperceptions.

Plaintiff testified that, early after the original custody order, EC made a statement that caused her to be concerned about abuse and she brought the child to Karen McDonald, Ph.D. seeking to determine the validity of any concern arising from the comment. McDonald confirmed that sexual abuse had occurred and contacted the Georgia CPS and was instructed to contact defendant's local police department. Plaintiff took the child to Christine Petro, Psy.D. following contact from the investigating police department. Plaintiff asserted that Petro contacted CPS to file a report. Plaintiff reviewed various assertions regarding her overuse of medical services for the minor child but argued that the child was prescribed medication for pin worms and other issues, suggesting her medical concerns were reality-based. Plaintiff further disputed defendant's contention that EC's contracting of rashes in her genital area was the result of diaper use, given the child's completion of toilet training by the end of January 2013. Plaintiff contended that the examinations of EC did not involve invasive procedures.

Plaintiff denied filing any CPS report regarding EC and defendant or his parents. She also denied expressing to Newberry that she continued to believe that defendant abused EC. Plaintiff alleged that defendant sold marijuana.

Dr. Bow, testified regarding the 2013 report he prepared on behalf of the court. Dr. Bow indicated that plaintiff was situationally defensive and exhibited a "defiant, rebellious quality" and a lack of insight. He reported inconsistencies and irritability by plaintiff regarding issues pertaining to child support and child care expenses. Dr. Bow indicated that plaintiff would require re-evaluation if she continued to believe, contrary to the evidence, that EC was sexually abused to determine whether her beliefs were "truly delusional" or if she was "just being stubborn, rebellious, and inflexible and rigid."

Dr. Bow stressed that the purpose of his evaluation was to confirm whether the child had been subjected to sexual abuse. He found no connection between plaintiff's diagnosis of trichotillomania, a compulsive behavior, and her misperceptions regarding EC's alleged sexualized behavior. Dr. Bow concluded that plaintiff "was hypervigilant and misperceived some things and that hopefully . . . with the insight from the evaluation and through therapy that these problems would abate." Dr. Bow confirmed difficulties in securing an appropriate therapist for plaintiff given her location and out of state insurance. He noted that plaintiff fluctuated in her beliefs initially regarding whether sexual abuse occurred and for alternative periods, plaintiff would not indicate any concerns and would question whether she had misinterpreted EC's behavior.

Dr. Bow declined to engage in hypotheticals as exceeding his evaluation, instead suggesting that "the Court needs to look at [what has transpired since the evaluation] and determine if there's a pattern; and if there is a pattern, what action should be taken." When questioned whether the trial court should have "grave concerns" should the claims of sexual abuse continue to occur, Dr. Bow responded in the affirmative, explaining that having a "focus on sexualized behavior" can "skew[] their perception of the world" and is "just not good."

Dr. Bow indicated that plaintiff did contact him following defendant's time with EC reporting "increased problems," opining that plaintiff "sexualizes things or interactions." Despite concerns regarding certain personality traits exhibited by plaintiff, Dr. Bow declined to "diagnose her as a personality disorder or psychopathology." Overall, in such situations, Dr. Bow opined that the outcomes are "fairly good" and that only when the issue of sexual abuse continues to be reasserted "where there is not a problem, that's where the red flags" arise. Dr. Bow stated that he did not view this case "as medical child abuse." When questioned whether plaintiff's statement to Newberry was surprising given plaintiff's participation in therapy, Dr. Bow stated "it's not a good indicator," while simultaneously recognizing that plaintiff's treatment had only been occurring for a three month period. He confirmed, at the time of plaintiff's evaluation, that he believed her to be "a sincerely hypervigilant mother [who] inaccurately believes her daughter has been the victim of sexual abuse." He also opined that although defendant "doesn't meet any diagnostic category," he did exhibit "a tendency to be overbearing and over controlling," which "could be an issue."

As part of the evidentiary hearing, the de benne esse depositions of Dr. Mohr and Dr. Buchanan were entered into evidence. Dr. Mohr related that she conducted a "head to toe" evaluation of EC, finding everything to be normal. She confirmed that the behavior reported did not lead to a suspicion of sexual abuse. Dr. Mohr did not perceive plaintiff as being untruthful, but rather as misperceiving the importance or interpretation of certain behaviors she observed with regard to EC. Dr. Mohr opined that it would be difficult to assert that plaintiff was wrong to report a sincerely held belief of questionable behavior with EC. Dr. Mohr indicated that the physical examination of EC was not traumatic or invasive and was typical of an examination conducted by any pediatrician. She further stated she was not diagnosing medical child abuse in this case, and that it was premature to suspect such a diagnosis. While acknowledging that plaintiff was focused on "vaginal" concerns regarding EC, she further indicated that hypervigilance should not necessarily be interpreted as encompassing an entirely negative connotation and further noted the different level of knowledge maintained by a new mother as contrasted to a medical professional, particularly in the ability to identify actual health conditions necessitating concern.

Dr. Buchanan interviewed plaintiff on October 28, 2013, after having received and reviewed Dr. Bow's evaluation. At the time of his deposition, Dr. Buchanan had conducted 11 sessions with plaintiff. The sessions occurred, on average, on an every other week basis. He described plaintiff as punctual, alert and involved in the therapy sessions. He also described plaintiff as a "rule follower," with obsessive-compulsive and perfectionism tendencies. He described plaintiff as being "confused" at the onset of therapy, accepting that abuse had not occurred but unable to comprehend how she could have so misconstrued the behaviors she observed. Dr. Buchanan described the therapeutic process as comprising a "layered approach" and an ongoing process. He opined that plaintiff had more insight and self-awareness and better

self-control. He found plaintiff to have issues of trust in general and that plaintiff had engaged in selective attention, taking certain observations and details and using them to fit her conceptions or beliefs. Dr. Buchanan indicated that plaintiff was no longer making statements currently regarding a belief that sexual abuse had occurred, with plaintiff demonstrating early in therapy a concern regarding what could happen rather than a conviction that abuse did occur.

Dr. Buchanan noted that plaintiff had not made any new accusations of abuse or suspected abuse since the onset of treatment and that plaintiff was demonstrating greater clarity in her thoughts regarding such matters. Plaintiff lacked a good mother figure during her formative years and attempted to fulfill her parental or mother role by being the extreme opposite of her own biological mother and focusing on listening and being attentive to EC, which contributes to her hypervigilance.

Dr. Buchanan summarized plaintiff's progress by noting that she was beginning to understand how she misconstrued information. She was acquiring a better understanding of normal childhood development and that she failed to adequately evaluate or took too seriously certain statements by EC. She recognized that the information she provided to certain individuals, such as Dr. McDonald, may have influenced the evaluation performed by that individual. Plaintiff acknowledged she permitted her worries to become exaggerated and was selectively attentive to those behaviors or statements by EC that would coincide with signs or symptoms of sexual abuse. Plaintiff further indicated that she was never fully convinced that sexual abuse had occurred, but rather was motivated by a desire to protect and now recognized that the concerns were "my issue" and not necessarily reality. As a result, Dr. Buchanan opined that plaintiff understood how her misperceptions occurred and the focus of therapy involves efforts to continue to prevent future occurrences.

Dr. Buchanan diagnosed plaintiff with obsessive-compulsive disorder and trichotillomania. He did not believe that plaintiff met the criteria for post-traumatic stress disorder (PTSD) or medical abuse. He further noted that the entire case was premised on the accusations that arose and, although he expressed concerned about the statement that plaintiff made to Newberry in January 2013, he maintained that plaintiff had gained a better understanding of her own behavior and the dynamics that led to the current situation.

On December 8, 2014, the trial court entered an order for supervised parenting time for plaintiff, indicating her parenting time should occur at the home of the maternal grandparents. Plaintiff could, without being accompanied, transport EC to and from parenting time to school. A parenting schedule of alternating weekends and one overnight during the week was finalized. Plaintiff was precluded from entering EC's school or speaking with her teachers. On December 22, 2014, plaintiff submitted proof of her participation in counseling with the Michigan therapist, Carol Schwartz.

On January 6, 2015, defendant moved to modify plaintiff's parenting time based on plaintiff having been stopped for operating a vehicle under the influence, (OUI), her third alcohol-related offense, and also moved to enforce the trial court's order regarding therapy.

On January 7, 2015, the trial court entered an order temporarily suspending plaintiff's parenting time and requiring her to undergo, at her expense, "a full substance abuse assessment

with Lannie McRill beginning January 8, 2015 at 2:00 p.m." The trial court also "re-opened" the proofs "to accept evidence of plaintiff's third alcohol related offense and any other newly discovered evidence in the best interest of the minor child."

On January 12, 2015, the trial court took telephonic testimony from McRill. McRill noted that plaintiff did appear, albeit late, for her second scheduled appointment, noting that she did contact him to advise him regarding her delay. Plaintiff's nails were too short to sample for testing and she objected to a blood draw. The trial suspected plaintiff attempted to adulterate the testing results.

With regard to the concerns raised by defendant pertaining to plaintiff's initiation of therapy without having first provided the new therapist with Dr. Bow's report, the trial court found that plaintiff's actions were not done in "bad faith." At the conclusion of the hearing, the trial court ordered that plaintiff's parenting time with EC remain supervised and in a "controlled setting," with plaintiff not permitted to transport EC.

McRill submitted a report in March 2015. McRill noted that plaintiff "attempted to omit her 2013 and 2014 marijuana use history during this evaluation," initially denying usage but later acknowledging an attempt "to present an overly favorable profile of herself." Plaintiff acknowledged use of marijuana, Ecstasy, cocaine and LSD in the past. In high school and college, plaintiff admitted to smoking marijuana multiple times during the week, but reported recent use of approximately one time a month. She denied that she experienced any problems due to her alcohol consumption or marijuana usage. McRill recommended that plaintiff be engaged in both alcohol and drug testing for the next 24-month period and participate in professional substance abuse and psychotherapy, eliminate all alcohol and illegal drug use with six-month review intervals of progress. McRill further opined "that a parenting time program be developed to reduce the opportunity for impaired parenting."

Subsequently, at a hearing, the trial court indicated it delayed taking further action pending the receipt of McRill's report and it found the content of the report "shocking," stating plaintiff's "self-reported history, substance abuse history . . . shocks this court." It was noted at the hearing that plaintiff had not had any contact with EC for three months. The trial court indicated it would grant plaintiff supervised parenting time, with relatives of defendant acting as supervisors, on alternate Saturdays from noon to 3:00 p.m., and required plaintiff's continued participation in therapy pursuant to the directive and choice of therapist by Dr. Bow. A written order memorializing the trial court's ruling was entered March 20, 2015.

In September 2015, plaintiff filed a motion seeking a modification of parenting time asserting her Sobriety Court compliance and defendant's purposeful exclusion of plaintiff from important events in EC's life, such as her first day of kindergarten, birthdays, and holidays.

On October 5, 2015, the trial court issued an order granting defendant's motion for change of custody and denying plaintiff's motion for modification of parenting time. The trial court awarded defendant sole physical and legal custody of EC. Plaintiff was ordered to attend weekly therapy with Dr. Judith Margerum, who was mandated to report on plaintiff's progress to the trial court at six month intervals for a two-year period. Plaintiff's parenting time was maintained in accordance with the March 20, 2015 order and permitted the parenting time

-9-

supervisors the "authority to terminate the parenting time if Plaintiff appeared to be high or intoxicated." The trial court denied plaintiff's motion to modify parenting time pending her initiation of therapy with Dr. Margerum and demonstration of "progress" to the extent "that the Court's present concerns about the endangerment of the child's physical, mental, or emotional health due to Plaintiff's Mental health and substance abuse issues are alleviated."

Subsequently, the trial court issued a 66-page opinion to coincide with and explain its October 5, 2015 order. Following an extended discussion of the history of the proceedings, the trial court indicated the existence of proper cause or changed circumstances on March 10, 2014, to revisit custody  The trial court indicated that EC's established custodial environment was, at the time, with plaintiff and indicating that defendant carried "the burden of proving by clear and convincing evidence that a change of custody is in the best interests of the minor child." The trial court then proceeded to make findings with respect to the best interest factors, which are discussed in more detail *infra*. The court ultimately concluded:

> Defendant has demonstrated by clear and convincing evidence that modification of custody from sole physical custody with Plaintiff with joint legal custody by Plaintiff and Defendant, to sole physical custody with Defendant and, due to the demonstrated inability of the parties to communicate about the minor child or to make joint selections regarding major life choices for the minor child as well as the serious concerns that have been raised about Plaintiff's mental stability and substance abuse, sole legal custody to Defendant is in the best interests of the minor child.

The trial court indicated it would not revisit the issue of parenting time "in light of the change of custody." Referencing the factors elucidated in MCL 722.27a(6), the trial court found only "factors c [likelihood of abuse or neglect] and f [exercise of parenting time] bear examination." The trial court opined, in accordance with factor (c) that "due to the harm that Plaintiff has caused to the minor child and can be anticipated to cause in the near future, the minor child's parenting time with Plaintiff must be severely limited." The trial court required plaintiff to treat with Dr. Margerum, and that specific documents be provided to the therapist before treatment initiated. The trial court deemed McRill's recommendations also to be "pertinent" to plaintiff's "exercise of parenting time," requiring her to attend Alcoholics Anonymous or Narcotics Anonymous in conjunction with addressing plaintiff's substance abuse in her treatment with Dr. Margerum. Plaintiff was ordered to "undergo alcohol and substance abuse testing for the next 24 months" with all reports to be provided to the trial court, the "LGAL, and counsel for the parties." The trial court found plaintiff to not be "cooperative" with the trial court's order to undergo an immediate substance abuse assessment with McRill, resulting in delays and loss of parenting time. The trial court denied plaintiff's motion for modification of parenting time, ordering supervised parenting time in accordance with the March 20, 2015 order and indicating that no expansion of parenting time was permissible without the trial court's approval. This appeal ensued.

## B.  STANDARDS OF REVIEW

In reviewing child custody and parenting time orders, we review the trial court's factual findings under the great weight of the evidence standard, while discretionary rulings such as

-10-

custody decisions are reviewed for an abuse of discretion and questions of law are reviewed for clear error. MCL 722.28; *Pickering v Pickering*, 268 Mich App 1, 5; 706 NW2d 835 (2005). "Under the great weight of the evidence standard, this Court should not substitute its judgment on questions of fact unless the facts clearly preponderate in the opposite direction." *Shade v Wright*, 291 Mich App 17, 21; 805 NW2d 1 (2010). In child custody cases, "[a]n abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). Clear legal error occurs "when the trial court errs in its choice, interpretation, or application of the existing law." *Shulick v Richards*, 273 Mich App 320, 323; 729 NW2d 533 (2006).

## C. GOVERNING LAW

Plaintiff challenges the trial court's determination with respect to proper cause or changed circumstances, established custodial environment, the court's application of the best interest factors and its discretionary decision to change custody, and she challenges the court's parenting time order.

In *Vodvarka v Grasmeyer*, 259 Mich App 499, 508; 675 NW2d 847 (2003), this Court clarified that a party seeking to change a valid prior custody determination (order or judgment) requires that the trial court make a threshold inquiry to determine whether there are changed circumstances or proper cause shown to warrant revisiting the issue of custody. Specifically,

> [t]he movant has the burden of proving by a preponderance of the evidence that either proper cause or a change of circumstances exists before the trial court can consider whether an established custodial environment exists (thus establishing the burden of proof) and conduct a review of the best interest factors. [1 Kelly, Curtis & Roane, Michigan Family Law (7th ed) (ICLE, 2011), § 12.33, p 673-674, citing *Vodvarka*, 259 Mich App at 509.]

In the event that the movant can show changed circumstances or proper cause by a preponderance of the evidence, in order to ascertain the proper burden of proof for changing custody, the trial court must then proceed to determine whether there is an established custodial environment. *Vodvarka*, 259 Mich App at 509. In the event that the movant seeks to change an established custodial environment, the movant has the burden to prove by clear and convincing evidence that a change in custody is in the child's best interests. *Id*.; MCL 722.27(1)(c). If the movant is not seeking to change an established custodial environment, then the movant has the burden to show by a preponderance of the evidence that a change in custody is in the child's best interests. *Foskett v Foskett*, 247 Mich App 1, 6-7; 634 NW2d 363 (2001).

After ascertaining the proper burden of proof to change custody, a trial court must then determine whether the proposed custody change is in the best interests of the child by applying the best interest factors set forth in MCL 722.23. *Foskett*, 247 Mich App at 9.

## D. ANALYSIS

### I. PROPER CAUSE/CHANGED CIRCUMSTANCES

-11-

Initially, plaintiff argues that the trial court erred when it found that defendant proved by a preponderance of the evidence that there were changed circumstances or proper cause to revisit the issue of custody.

A "change of circumstances" is established when it is demonstrated by the movant that "since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a *significant* effect on the child's well-being, have materially changed." *Vodvarka*, 259 Mich App at 513-514. "The phrase "proper cause" is not by the words themselves tied to a change in events as is 'change of circumstances.' Rather, proper cause is geared more toward the significance of the facts or events or, as stated earlier, the appropriateness of the grounds offered." *Id*. Normal life changes will not suffice, rather, "the evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child." *Id*. Furthermore, in making this determination, proper cause or changed circumstances "should be relevant to at least one of the twelve statutory best interest factors." *Id*. at 512.

The initial custody order in this case was entered on August 24, 2011, awarding the parties joint legal custody with physical custody to plaintiff. On August 8, 2013, defendant moved to change custody. Thereafter, the trial court entered an order on March 10, 2014, limiting plaintiff to parenting time. In doing so, the trial court erroneously changed custody without first having determined whether there was changed circumstances or proper cause and this Court therefore vacated the court's order. Subsequently, the trial court made findings of fact and determined that defendant had shown proper cause to revisit custody. The trial court set forth its findings in a June 4, 2014, order. In that order, the trial court found evidence "establishing proper cause" sufficient to hold a custody hearing, explaining that plaintiff made repeated allegations that defendant sexually abused EC, that the allegations caused EC to be subjected to "questioning, forensic interviews, and examinations by multiple individuals," and "invasive medical gynecological" exams. The trial court further found that there were four separate CPS investigations, though the trial court failed to articulate that one of the investigations was brought about by defendant's initiating a complaint against plaintiff. The court found that none of plaintiff's allegations were substantiated by a number of professionals. In addition, the trial court noted plaintiff reported that EC suffered panic attacks, which was never substantiated.

The trial court noted that Dr. Buchanan indicated that if plaintiff continued operating under the misperception that defendant sexually abused the child, it would be "bad for the child." The court acknowledged that Dr. Buchanan indicated that he believed that plaintiff had come to the realization that defendant did not abuse EC; however, the court noted that in a January 2014 interview, plaintiff indicated to Newberry of the FOC that she felt that defendant sexually abused EC. The court concluded, "[t]his is a grave indicator that, contrary to Dr. Buchanan's testimony, Plaintiff in fact continued to believe that the alleged sexual abuse had occurred." Accordingly, the court concluded that there was a preponderance of the evidence to establish proper cause to revisit custody.

Initially we note that the trial court erred in finding that EC was subjected to "invasive medical gynecological" exams. The record does not support this finding and instead shows that

-12-

EC was subjected to normal pediatric examinations during the CPS investigations. Nevertheless, the trial court's finding that there was a preponderance of the evidence to show proper cause to revisit custody was not against the great weight of the evidence in that the record evidence does not "clearly preponderate in the opposite direction." *Shade*, 291 Mich App at 21. Here, defendant made a threshold showing that the conditions surrounding custody had materially changed and that the changed conditions could have a significant impact on EC's well-being. In the lead up to[2] and immediately after the original custody order, plaintiff's actions led to two CPS investigations based on her unfounded belief that defendant sexually abused EC. Numerous professionals investigated the case and EC underwent physical examinations and interviews. All of the professionals involved concluded that the allegations were unfounded. Despite these findings, as recently as January 2014, plaintiff maintained to Newberry that she felt that defendant sexually abused EC. While Dr. Buchanan testified that plaintiff had come to accept that defendant did not abuse EC, during his therapy sessions, Dr. Buchanan was unaware of the statement plaintiff made to Newberry. Dr. Buchanan indicated that if plaintiff continued to believe that defendant did abuse EC, it would be detrimental to the child.

In short, the record supported that more than one CPS investigation had occurred since the last custody order, with commensurate evaluations by various individuals, agencies and experts, based on unsubstantiated allegations of suspected sexual abuse of EC, which if continued could negatively affect EC. The trial court's finding that these circumstances were more than normal life changes that would almost certainly have an effect on EC was not against the great weight of the evidence. *Vodvarka*, 259 Mich App at 507-508. Additionally, the trial court did not err in finding that circumstances related to the best interest factors including factor (b) (capacity to give the child guidance) and factor j (willingness to facilitate a parent-child relationship with the other parent).

Plaintiff makes much of the fact that Newberry opined that there was no change of circumstances sufficient to justify the trial court's decision to revisit custody. The argument has little merit for the simple fact that the trial court was not bound by Newberry's opinion. Rather, determining whether there was a preponderance of the evidence to show proper cause or changed circumstances involves a wide-ranging inquiry into the relevant facts and circumstances. See *Mitchell v Mitchell*, 296 Mich App 513, 517; 823 NW2d 153 (2012). And, issues involving weight of the evidence and credibility of witnesses falls within the purview of the trial court. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). As discussed above, considering the totality of the circumstances, the trial court's finding that there was proper cause to revisit custody was not against the great weight of the evidence. *Vodvarka*, 259 Mich App at 507-508.

## II. CUSTODIAL ENVIRONMENT

Next, plaintiff argues that the trial court erred in failing to make a determination regarding custodial environment.

___

[2] It appears that, at the time the trial court entered the original custody order, it was unaware of the initial CPS investigation.

-13-

As noted above, before changing a prior valid custody order, a court must first determine whether there is an established custodial environment to ascertain the burden of proof for changing custody. *Vodvarka*, 259 Mich App at 509. In accordance with MCL 722.27(1)(c), a custodial environment is established if "over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort."

In this case, as noted above, on March 10, 2014, the trial court entered an order that amounted to a change in custody. The trial court did this without determining whether there was proper cause or changed circumstances and without inquiring into whether there was an established custodial environment with plaintiff. The trial court indicated at the time that it was not yet prepared to address the issue of custodial environment. Subsequently, this Court vacated the March 10, 2014, order. On remand, in a June 3, 2014, order, the trial court found that there was an established custodial environment with plaintiff such that defendant needed to prove by clear and convincing evidence that a change in custody was in EC's best interests. To the extent that plaintiff argues that the trial court erred when it failed to determine custodial environment before it entered the March 10, 2014, order, that argument is moot because this Court vacated the March 10, 2014 order. To the extent plaintiff argues that the trial court failed to determine custodial environment on remand that argument also fails because the trial court determined that there was an established custodial environment with plaintiff.

## III. BEST INTEREST FACTORS

Next, plaintiff argues that the trial court "considered the wrong facts" and abused its discretion in failing to consider the "relevant facts." Plaintiff also challenges the court's October 5, 2015, findings with respect to the best interest factors. Given that the court's factual findings were related to its findings on the best interest factors, we treat both of plaintiff's arguments as a challenge to the court's findings on the best interest factors.

The best interest factors are set forth in MCL 722.23. "A court need not give equal weight to all the factors, but may consider the relative weight of the factors as appropriate to the circumstances." *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006).

Factor (a) pertains to "[t]he love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The trial court found that both parents loved EC, that EC loved both parents, and that EC sought out each of her parents. However, the trial court weighed this factor in favor of defendant, explaining that "the relationship between Plaintiff and the minor child was more like a relationship between friends than a parent-child relationship." The trial court proceeded to assert that the testimony demonstrated "improper boundaries between Plaintiff and the minor child and also a lack of understanding on Plaintiff's part of how to interact with the minor child on a developmentally appropriate level." The court also noted plaintiff's false accusations regarding defendant's alleged sexual abuse of EC. However, the court did not articulate how the "improper boundaries" and the CPS allegations were relative to whether the parties had love, affection and emotional ties with the child. As such, the evidence clearly preponderates against the court's conclusion that factor (a) weighed in favor of defendant.

-14-

Factor (b) considers "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). The trial court found that this factor favored defendant. The trial court found "that the stronger and more appropriate future bond will be between Defendant and the minor child" premised on the past "unsubstantiated allegations of sexual abuse," which has "utterly compromised [Plaintiff's] ability to give the minor child guidance." Although recognizing the absence of the filing of any allegations since April 9, 2013, the trial court found that "plaintiff continued to make statements to others stating or intimating that Defendant had sexually abused the minor child." The trial court indicated that plaintiff's belief that abuse occurred persisted, and the trial court deemed that belief "detrimental to the minor child" and demonstrative of plaintiff's "lack [of] the capacity to provide proper guidance to the minor child." In addition, the trial court referenced evidence that plaintiff had, in the past, discussed sexual abuse issues with EC or with others in the presence of EC as demonstrating "a lack of judgment . . . that impedes her ability to give the minor child guidance." Because both parties were raised as Catholics, this aspect of the factor was found to favor neither party.

Clearly, the trial court's focus on this factor was targeted on plaintiff's capacity or ability to provide the child with "guidance," which it deemed to be impaired because of plaintiff's prior and allegedly continuing preoccupation with sexual concerns pertaining to EC. In other words, plaintiff's past behaviors, both overt and verbal, involving EC in sexual abuse investigations, coupled with any lingering beliefs by plaintiff contrary to the determination of various professionals that such abuse did not occur, impaired plaintiff's ability to provide EC with proper guidance in the future. Because there was record evidence to support that plaintiff's history contributed to her misconceptions, which were projected onto EC's behavior and had the potential to misguide EC if uncorrected, the trial court's overall determination on this factor was not against the great weight of the evidence.

Factor (c) concerns an evaluation of "the capacity and disposition of the parties to provide the child with food, clothing, [and] medical care[.]" MCL 722.23(c). Defendant was again favored on this factor, citing to plaintiff's delinquent payment of fees owed to the LGAL and the difficulty in obtaining the funds to pay for court-ordered evaluations, such as that required regarding McRill. The trial court further questioned plaintiff's ability to "provide appropriate medical care . . . due to her fixation on sexual abuse and her history of inciting protective services investigations of Defendant and his family for sexual abuse." The trial court characterized plaintiff as being "dismissive" of the possible "deleterious effects" that could ensue from subjecting EC to "multiple sexual abuse examinations."

The trial court did recognize that plaintiff attained a higher level of education than defendant and that while in Georgia she was employed, provided necessities for EC, and was purchasing a home. Defendant is primarily self-employed, provides for daily necessities for the EC and also was purchasing a residence. The trial court favorably noted that defendant paid for the child's medical insurance and that he borrowed extensive amounts of monies from family members to continue the litigation.

The trial court also expressed concern that plaintiff was incapable of providing EC with appropriate medical care "due to her fixation on sexual abuse" and her alleged failure to comprehend the possible consequences for pursuing medical services on this basis. Based on the

-15-

expression of concern by various experts regarding plaintiff's "sincere hypervigilance" and "misinterpretation" of certain behaviors by EC or physical symptoms, the evidence did not clearly preponderate in the opposite direction of the trial court's findings on this factor.

Factor (d) "considers how long the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," MCL 722.23(d), and factor (e) concerns the "permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). The trial court favored defendant on both of these factors. The trial court reasoned that defendant obtained his residence before EC's second birthday and had consistently exercised parenting time. The court also noted that defendant's home was in close proximity to his family and defendant recently was married. In contrast, the court found that plaintiff's living arrangements were "nomadic." Plaintiff returned to Michigan, alternatively living with her adoptive father and stepmother, whose residence she left at the end of December in 2014 or the onset of January 2015, with a 30-day incarceration for her third alcohol-related driving offense, followed by an apartment residence in Northville. The trial court found the stability previously exhibited in plaintiff's adoptive father's home "has been upended" due to the divorce initiated between the maternal adoptive father and his current wife, and the subsequent exclusion of plaintiff from their residence. The trial court assumed that plaintiff's only current contact was with her adoptive father. The trial court further stated that "Plaintiff's perpetuation of sexual abuse charges against Defendant has jeopardized the minor child's mental wellbeing, rendering the minor child's environment with her unstable and unsatisfactory."

The trial court's findings were not against the great weight of the evidence. Here, defendant had a stable home and consistently exercised parenting time. In contrast, plaintiff's living arrangement had been somewhat fluid since she returned to Michigan and she had recently been incarcerated for 30 days following her conviction for OUI-second. In addition, during the time that EC was with plaintiff, there were multiple allegations regarding sexual abuse and experts testified that plaintiff was "hyper-vigilant." In short, the record does not clearly preponderate in the opposite direction of the trial court weighing this factor in favor of defendant.

Factor (f) pertains to the moral fitness of the parties. MCL 722.23(f). As discussed in *Fletcher*, 447 Mich at 886-887:

> Factor f (moral fitness), like all the other statutory factors, relates to a person's fitness as a parent. To evaluate parental fitness, courts must look to the parent-child relationship and the effect that the conduct at issue will have on that relationship. Thus, the question under factor f is not "who is the morally superior adult;" the question concerns the parties' relative fitness to provide for their child, given the moral disposition of each party as demonstrated by individual conduct. We hold that in making that finding, questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function as a parent.

The trial court found this factor to "strongly" favor defendant. The trial court noted that defendant had a couple misdemeanors while he was in college and plaintiff had several intoxicated driving offenses, including an OUI-second as recently as 2015. It found plaintiff's

-16-

assertion that defendant engaged in the sale of illegal drugs lacked credibility. It noted that defendant previously used marijuana, but had relinquished his medical marijuana card so that it would not interfere with his custody petition and that defendant averred that he never used marijuana when the child was present. As a result, the trial court opined that "Defendant's actions show a mature approach to parenting."

With respect to plaintiff, the trial court, in part, focused on plaintiff's convictions involving driving while intoxicated, demonstrating "a lack of a mature sensibility regarding alcohol consumption on her part." It was noted that plaintiff also tested positive for marijuana use and that her failure to admit such usage "dealt a significant blow" to her credibility. The trial court also referenced an episode where plaintiff misrepresented her level of professional licensing and other instances wherein plaintiff provided information regarding her background. The trial court also focused on "disturbing inconsistenc[ies]" regarding plaintiff's reports in January of 2013 to CPS regarding the date of occurrence of the alleged incident. Citing to previous behaviors and a "timeline" of medical history prepared by plaintiff, the trial court also referenced the "making and then maintaining [of] the sexual abuse allegations against Defendant and his parent" by plaintiff as "rais[ing] additional concerns about her moral fitness." The trial court further went into extensive detail regarding the timing of actions and statements by plaintiff regarding the abuse allegations and her "dilatory behavior during the pendency of this case, which slowed the resolution of issues and adversely affected other people," specifically citing to a delay in the provision of the child's medical records during one of the investigations. The trial court identified a "propensity to distort the truth by exaggerating greatly at times" and other instances of plaintiff's lack of veracity, concluding that plaintiff's "conduct shows that she acts without regard to consequences," which was deemed to affect her "ability to properly parent the minor child" and which "harmed Defendant's relationship with the minor child."

The trial court discussed a litany of issues under this factor wherein it failed to articulate how some of plaintiff's behaviors related to her fitness as a parent. For example, the court did not articulate how plaintiff's misrepresentation of her professional license made her less fit as a parent. Thus, while the trial court's findings may not support that this factor weighed "strongly" in favor of defendant, on the whole, the trial court's finding that the factor weighed in favor of defendant was not against the great weight of the evidence. Here, the record supported that plaintiff had issues with truthfulness, had a tendency to exaggerate, and failed to recognize the negative consequences of her actions. Plaintiff denied that she had issues with excessive consumption of alcohol and use of controlled substances. Plaintiff's conduct with respect to her attempts to evade drug and alcohol screening negatively impacted her fitness as a parent in that she was less likely to overcome the issues she had with alcohol and controlled substances. Furthermore, plaintiff denied that her consumption of alcohol was a problem despite having two convictions for OUI, including a recent conviction. That denial impacted plaintiff's fitness as a parent because it showed that plaintiff failed to recognize the negative consequences of some of her actions and that alcohol could pose a danger to her ability to parent EC. In short, having reviewed the record, the trial court's findings with respect to factor (f) were not against the great weight of the evidence.

Factor (g) pertains to the "mental and physical health of the parties involved." MCL 722.23(g). The trial court favored defendant on this factor, noting that his only physical health concern was sciatica and that psychological testing did not reveal "any diagnosable disorders."

-17-

The trial court discussed plaintiff's diagnoses of trichotillomania and obsessive compulsive disorder, which were determined to require therapy. The trial court focused on Dr. Bow's testimony that, if plaintiff maintained unwarranted beliefs of sexual abuse, this "could involve delusional disorder." The trial court determined that plaintiff's "conduct, regardless of the cause, has substantially harmed the minor child and Defendant, as well as impaired the minor child's interactions with other people." The court noted that plaintiff's unwarranted beliefs helped create a barrier between EC and defendant and negatively impacted EC's interactions with other people. The court noted that plaintiff informed Newberry that she felt that defendant did abuse EC and in court during her testimony plaintiff implied that the reason EC stopped the sexualized behavior was because defendant was aware there was an investigation. Citing to Dr. Bow's testimony, the trial court acknowledged that it "cannot find that medical child abuse occurred in this case," but went on to opine that "the psychological impact of Plaintiff's actions on the minor child cannot be understated; these actions were harmful to the minor child."

Having reviewed the record, while the trial court focused primarily on the negative impact of plaintiff's psychological issues, and failed to discuss the progress plaintiff made during her therapy sessions, we cannot conclude that the trial court's findings on this factor were against the great weight of the evidence. Here, evidence supported that plaintiff's psychological issues had a negative impact on the parent-child relationship and her own relationships. While plaintiff was making progress in her therapy sessions, testimony of the professionals supported that continued therapy would benefit her. In contrast, defendant did not have any health issues that were of concern and there was no evidence to suggest that any prior health issues impacted his ability to parent. Thus, the trial court's weighing this factor in favor of defendant was not against the great weight of the evidence.

Factor (h) pertains to the home, school, and community record of the minor child. MCL 722.23(h). The trial court found this factor to favor "neither party" because of EC's young age, "her permanent [school or academic] record cannot yet be assessed." Plaintiff argues she should have been favored on this factor based on EC's enrollment in a daycare or preschool program when in plaintiff's custody. However, EC was also enrolled in a Montessori preschool program while in defendant's custody. Furthermore, EC's young age and limited academic experiences comport with the trial court's finding on this factor and the finding was not against the great weight of the evidence.

Factor (i) pertains to the reasonable preference of the minor child. MCL 722.23(i). The trial court did not interview EC, finding it unnecessary to consider this factor "due to the age of the minor child, who is under six years of age." Plaintiff contends EC was six years of age at the time the trial court issued its opinion. This Court has previously determined that a child of six is presumptively of sufficient age to express a preference for purposes of this factor. *Bowers v Bowers*, 190 Mich App 51, 56; 475 NW2d 394 (1991). As discussed recently in *Maier v Maier*, 311 Mich App 218, 225; 874 NW2d 725 (2015) (citations and quotation marks omitted):

> Undoubtedly, an expression of preference by an intelligent, unbiased child might be the determining factor in deciding what the best interests of the child are. However, no court has ruled that every child over the age of six actually has the capacity to form a preference. Just as adults may lack the capacity to give competent testimony because of infirmity, disability, or other circumstances, so

may a child's presumed capacity be compromised by circumstances peculiar to that child's life.

In this instance, given that the majority of the trial court's findings on the best interests factors, even if the court had interviewed EC and had EC expressed a preference toward plaintiff, that finding would not have impacted the trial court's findings overall. Thus, any error by the trial court in failing to interview the child amounted was harmless. See *Sinicropi*, 273 Mich App at 182-183. Moreover, the trial court had discretion to determine whether EC was competent to express a preference given the circumstances. *Maier*, 311 Mich App at 225.

Factor (j) concerns "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. . . . " MCL 722.23(j). The trial court deemed this factor "strongly" favored defendant. While acknowledging that plaintiff had provided defendant with additional parenting time with the child, it opined that "these positive occurrences are more than negated by Plaintiff's other actions. . . ." To substantiate this statement, the trial court referenced the unsubstantiated sexual abuse allegations and subsequent "repercussions," the failure of plaintiff to compensate defendant for overpayment of EC's preschool expenses, transportation costs involving EC and other financial obligations. The trial court also referenced testimony from defendant's relatives that plaintiff made veiled negative statements pertaining to defendant, which EC understood, in conjunction with plaintiff's negative statements and failure to initially cooperate with defendant's election to enroll EC in an Ann Arbor preschool program. As a result, the trial court found: "Plaintiff's actions as a whole reflect little regard for her daughter's love for her father, little understanding of the importance of Defendant to the minor child, and little ability to set aside her animosity toward Defendant and to cooperate with him for the minor child's sake."

While plaintiff made allegations that defendant and his family verbally denigrated and maligned her to EC, and the court failed to note that defendant filed a CPS complaint against plaintiff, viewed as a whole, the trial court's findings with respect to this factor were not against the great weight of the evidence. Here, the trial court could have reasonably concluded that plaintiff's allegations regarding the sexual abused had a detrimental impact on defendant and EC's relationship. Because of the allegations, at one point, defendant had to have supervised parenting time with EC and he missed some parenting time that he would have otherwise had. In addition, defendant testified that on another occasion, plaintiff told him that he was not allowed to see EC. The evidence supported that plaintiff did not appreciate the importance of EC having a strong relationship with defendant. Finally, an extended family member testified that EC stated that plaintiff told her that defendant was not allowed to help her get dressed. This evidence supported the trial court's weighing factor (j) in favor of defendant.

Factor (k) pertains to "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). The trial court determined that this factor favored neither party, finding lack of "evidentiary corroboration" "that actual physical violence occurred between the parties." The trial court's findings were not against the great weight of the evidence. While the previous judge found plaintiff's allegations to be credible concerning defendant's temper, and while defendant admitted engaging in "heated" arguments involving the use of profanity, there was no evidence to corroborate that heated arguments rose

to the level of domestic violence. Accordingly, the trial court's findings were not against the great weight of the evidence.

Factor (l) is a "catchall" provision MCL 722.23(l), which encompasses "[a]ny other factor considered by the court to be relevant to a particular child custody dispute." The trial court determined that this factor strongly favored defendant, citing the inconsistency and inaccuracy in plaintiff's recollection and reporting of events, and her psychological diagnoses. In effect, the trial court used this factor to reiterate and further elaborate on its findings on other factors, such as (b), (f), (g) and (j). As such, the trial court's reiteration of its concerns under this factor, does not comprise a mere overlap with the other referenced factors, but instead evinces impermissible "double weighing." *Sinicropi*, 273 Mich App at 181. Accordingly, the court erred in weighing the factor in favor of defendant.

In sum, the trial court's findings with respect to factor (a) were against the great weight of the evidence and the court clearly erred with respect to its findings in regard to factor (l) in that it considered facts that were already taken into account in the other best interest factors. Factor (a) should have been weighed evenly between plaintiff and defendant and factor (l) should not have favored either party. However, the trial court found that factors (b), (c), (d), (e), (f), (g) and (j) favored defendant and that factors (h), (i) and (k) favored neither party; these findings were not against the great weight of the evidence. Accordingly, the trial court did not abuse its discretion in awarding physical and legal custody to defendant. *Pickering*, 268 Mich App 5; MCL 722.28.

Plaintiff argues that the trial court was biased against her because it weighed nearly all of the factors in favor of defendant. Plaintiff's argument lacks merit.

With regard to concerns of judicial bias, a judge is disqualified when he or she is unable to impartially hear a case. MCR 2.003(C); *Van Buren Charter Twp v Garter Belt, Inc*, 258 Mich App 594, 598; 673 NW2d 111 (2003). Further, a party challenging a judge "on the basis of bias or prejudice must overcome a heavy presumption of judicial impartiality." *Cain v Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996). A mandatory and exclusive procedure exists for seeking the disqualification of a judge, which is set forth in MCR 2.003. *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 22-23; 436 NW2d 70 (1989). Any claim of disqualification is deemed waived when there is a failure to comply with the court rule. *Id*. at 23.

Plaintiff did not comply with the procedure set forth in MCR 2.003 with respect to her belated judicial bias claim. Accordingly, she has waived this issue. *Id*. Moreover, given that the trial court's findings were not against the great weight of the evidence, plaintiff cannot overcome the "heavy presumption of judicial impartiality." *Cain*, 451 Mich at 497.

## IV. PARENTING TIME

Next, plaintiff argues that the trial court erred in denying her motion to modify parenting time. In part, plaintiff's request for an expansion of parenting time sought to identify individuals to provide supervision other than defendant's relatives. Plaintiff asserted the absence of problems during her supervised parenting time and her ongoing participation and compliance in

programs pertaining to her sobriety. Plaintiff's request was to permit her additional time with the minor child that would incorporate "milestones" or important events in the child's life, such as birthdays, holidays and other significant activities. Plaintiff's motion for modification of parenting time was filed on September 24, 2015, with the current parenting time restrictions having been imposed since March of 2015.

In its October 26, 2015 opinion, the trial court addressed and denied plaintiff's request for a modification of parenting time, "[i]n light of the potential for harm to the minor child[.]" The trial court asserted that before it would consider an expansion of plaintiff's parenting time that plaintiff "must enter therapy with Dr. Margerum and *make progress*." The trial court further reiterated that plaintiff would not be permitted to "drive with the minor child in the car until further order of the court." Supervised parenting time was to continue "every other Saturday from noon until 3 p.m. at a location arranged by one of the parenting time supervisors," and precluded any other "in person contact with the minor child." Video communications with the minor child were encouraged.

The trial court addressed the issue of parenting time, finding factors (c) and (f) of primary concern with reference to MCL 722.27a(3), (6). The trial court commensurately required plaintiff to participate in psychotherapy, which was to also incorporate issues of substance abuse. Plaintiff was required to attend Alcoholics Anonymous or Narcotics Anonymous on a weekly basis and "undergo alcohol and substance abuse testing for the next 24 months." Noting the LGAL's concern that plaintiff have parenting time with EC, albeit supervised, the trial court concurred that "contact should not be totally eliminated . . . so that Plaintiff can have an opportunity through therapy to address her issues and become a better parent for the minor child." The trial court also expressed concern regarding plaintiff's dilatory conduct in securing the substance abuse testing with McRill, and instances of failure to follow through on arranged verbal contact with EC, which led the trial court to question "Plaintiff's ability to exercise parenting time consistently."

The trial court clearly erred in denying plaintiff's motion to modify parenting time because the court erred in entering its most recent parenting time order. In *Shade*, 291 Mich App at 29, this Court explained that "the focus of parenting time is to foster a strong relationship between the child and the child's parents." Specifically:

> [p]arenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time. [*Shade*, 291 Mich App at 29, quoting MCL 722.27a(1).]

The age of the minor child and their related stage of development are also recognized as significant factors in the determination of a parenting time schedule. *Shade*, 291 Mich App at 30.

In this case, the trial court entered a parenting time order that limited plaintiff to six hours of supervised parenting per month. The trial court failed to explain how limiting plaintiff to six hours of supervised parenting time per month with no time for special occasions and holidays fosters a strong relationship between plaintiff and EC. The court expressed concerns regarding potential future behavior and the assertion that EC experienced endangerment at the hands of plaintiff. However, the trial court failed to recognize plaintiff's recent demonstration of sobriety or participation and willingness to continue to engage in ongoing therapy. Furthermore, the court did not provide specifics or define with any particularity what "progress" or behavioral parameters plaintiff was required to demonstrate before she could obtain expanded parenting time. In addition, the court failed to consider the favorable testimony that the professionals, particularly Dr. Buchanan, offered regarding plaintiff's progress and instead placed heavy emphasis on her shortfalls. Indeed, none of the experts recommended that plaintiff be limited to minimal supervised parenting time and there was no testimony that plaintiff presented a danger to EC or failed to provide proper care for the child. Further, Dr. Buchanan testified that plaintiff was making progress on the issues of concern that he identified and Newberry did not question plaintiff's ability to provide proper parental care for EC. Indeed, none of the experts indicated that plaintiff could not provide proper care and guidance for EC. Other than the limitation regarding driving with EC, the trial court failed to articulate how the restrictions it placed on plaintiff were in EC's best interests or furthered a close bond between plaintiff and EC. Instead, the record supported that plaintiff was a loving parent who, despite many mistakes, was making progress on personal improvement and who could provide adequate love and care for EC.

In short, the trial court failed to articulate how its parenting-time order was in EC's best interest taking into account the parenting-time best interest factors in MCL 722.27a(6); the court also failed to consider that the focus of any parenting-time order must be to "foster a strong relationship between the child and the child's parents." *Shade*, 291 Mich App at 29. The trial court's parenting-time order does not foster a strong relationship between EC and plaintiff. Accordingly, we vacate that part of the trial court's October 5, 2015 order denying plaintiff's motion to modify parenting time and remand to the trial court for entry of a parenting time order that complies with *Shade*, 291 Mich App at 29 and MCL 722.27a(6).

## V. MCR 3.210(C)

Finally, plaintiff contends the trial court's failure to adhere to the time restrictions of MCR 3.201(C)(3) constituted error.

"For an issue to be preserved for appellate review it must be raised, addressed, and decided by the lower court." *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). For the first time on appeal, plaintiff contests the trial court's failure to issue a decision following the conclusion of the evidentiary hearing in accordance with the time restrictions of MCR 3.210(C)(3). The issue is not preserved for appellate review.

"[T]he interpretation and application of the court rules, like the interpretation of statutes, is a question of law that is reviewed de novo on appeal." *Shawl v Spence Bros, Inc*, 280 Mich App 213, 218; 760 NW2d 674 (2008). Unpreserved issues, however, are reviewed for plain error affecting substantial rights. *Wolford v Duncan*, 279 Mich App 631, 641; 760 NW2d 253 (2008). In accordance with the plain error rule, the objecting party must demonstrate that (1) an

error occurred, (2) the error is plain or obvious, and (3) the error affected a substantial right. *Kern*, 240 Mich App at 336.

The relevant portions of MCR 3.210(C), pertaining to the custody of a minor, provide:

(1) When the custody of a minor is contested, a hearing on the matter must be held within 56 days

(a) after the court orders, or

(b) after the filing of notice that a custody hearing is requested, unless both parties agree to mediation under MCL 552.513 and mediation is unsuccessful, in which event the hearing must be held within 56 days after the final mediation session.

* * *

(3) The court must enter a decision within 28 days after the hearing.

* * *

(7) The court may extend for good cause the time within which a hearing must be held and a decision rendered under this subrule.

Defendant filed a motion for a change of custody in August of 2013, which was initially denied, leading defendant to refile his motion a short time later. On March 10, 2014, the trial court effectively ordered a change of custody and domicile for the minor child, and then proceeded to conduct additional hearings and an evidentiary hearing that initially spanned from June 11, 2014 through December 8, 2014. The trial court did not enter an order granting defendant's motion to change custody, following additional hearings and the reopening of proofs, until October 5, 2015, with an opinion explicating its reasoning filed with the lower court clerk on October 26, 2015. Hence, from the initiation of defendant's motion to the issuance of an order and opinion on the issue of custody, at least 25 months have lapsed. Thus, the court did not comply with MCR 3.210(C)(3). This is not fatal, however, given the additional provision in MCR 3.210(C)(7), which permits an extension of the referenced time frame "for good cause."[3] Moreover, even if the delay was unwarranted in this case, given the court did not abuse its discretion with respect to the custody decision, plaintiff is not entitled to relief.

E. CONCLUSIONS

---

[3] We note that on remand, the trial court must comply with the time deadlines set forth in MCR 3.210. There were multiple delays in this case and multiple factual findings that were made after the court made a ruling. These delays and procedural missteps needlessly increased the complexity and duration of this case and were not in the best interests of EC or either of the parties. On remand, the trial court must adhere to the proper procedural rules and steps that are in place to facilitate the timely resolution of custody disputes.

The trial court did not err in finding that there was proper cause to revisit custody, the trial court did not err in finding that there was an established custodial environment with plaintiff, the majority of the trial court's findings on the best interest factors were not against the great weight of the evidence, the trial court erred in denying plaintiff's motion to modify parenting time, and plaintiff is not entitled to relief based on the trial court's failure to comply with MCR 3.210(C)(3).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed, no costs are awarded. MCR 7.219(A).


/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Riordan